## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FRANK P. BONETT,

      Plaintiff,

v.                                Case No: 8:20-cv-2106-CEH-TGW

CHRISTOPHER COOK and BOB
GUALTIERI,

      Defendants.

_____/

# O R D E R

      This cause comes before the Court upon Defendant Christopher Cook's Motion for Final Summary Judgment (Doc. 34) and Defendant Bob Gualtieri's Motion for Final Summary Judgment (Doc. 36). Plaintiff Frank P. Bonett responds in opposition to both motions (Doc. 44), to which Cook and Gualtieri reply (Doc. 56).

      Officer Frank P. Bonett's vacation in Pinellas County, Florida, took an unfortunate turn when a Pinellas County sheriff's deputy arrested him, his ex-brother-in-law, and his ex-brother-in-law's wife. Bonett now sues the arresting deputy, Deputy Christopher Cook, individually under 42 U.S.C. § 1983 and Pinellas County Sheriff Bob Gualtieri under Florida law. Cook and Gualtieri seek summary judgment. For the reasons set forth below, the Court will grant Cook's motion for summary judgment and grant Gualtieri's motion for summary judgment.

## I.    BACKGROUND

### A. Factual Background[1]

#### i. Introduction

The Philadelphia Police Department has employed Frank P. Bonett for approximately 25 years. Doc. 34-7 at 16:11–25, 26:1; Doc. 34-8 at 4, 25; Doc. 44-6 ¶1. He describes himself as a "police officer slash investigator." Doc. 34-7 at 16:16–19. Since 2010, he has worked in an investigative role. *Id.* at 17:2–3. He currently works in the Dangerous Drug Offender Unit of the District Attorney's Office. Doc. 44-6 ¶3.

On April 30, 2019, Bonett vacationed in Pinellas County, Florida, with Paul Seeger, Cindy Caine, Bill Caine, and others. Doc. 34-7 at 24:7–12, 25:23–25, 26:1–17. Paul and Cindy are married. Doc. 34-4 at 11; Doc. 34-8 at 11, 30. Paul was previously married to Bonett's sister. *See* Doc. 34-7 at 251:18–19. The Philadelphia Police Department employed Paul as a police sergeant until 2009. Doc. 34-9 at 2–5; Doc. 34-7 at 251:15–19. The Philadelphia Police Department has employed Cindy as a police officer for over 20 years and has employed Bill—Cindy's brother—as a police officer for approximately 24 years. *Id.* at 4, 19, 30.

Earlier that day, around 2:00 p.m. or 3:00 p.m., Bonett, his wife, Paul, Cindy, and Bill traveled to John's Pass, a venue with shops and bars. Doc. 34-7 at 46:17–24.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based upon the parties' submissions, including: the parties' Stipulation of Agreed Material Facts (Doc. 45), depositions, affidavits, reports and documents about the arrests, video evidence, audio evidence, records from the Philadelphia Police Department, Internal Affairs Division documents, William T. Gaut's expert report, and photographs.

They were at this venue for approximately seven or eight hours. *Id.* at 51:9–11. They drank alcoholic beverages while there. *Id.* at 48:11–16, 53:3–13. Bonett estimated that he drank approximately nine Coors Lights throughout the day, *id.* at 48:11–16, or "one beer an hour over an approximately 8 to 9 hour period," Doc. 44-6 ¶5. They left the venue and arrived at Crabby Bill's Restaurant around 10:00 p.m. *Id.* at 54:10–21, 56:4–6. Bonett stated that he had not consumed any alcoholic beverages for "well over an hour" at the time when the incident giving rise to this action occurred. Doc. 44-6 ¶5.

At some point, Kenneth Anderson, a manager at Crabby Bill's, observed a man and a woman arguing. Doc. 34-4 at 14. When he inquired whether "everything was OK," the woman responded, "We're fine." *Id.* Anderson observed that, although the woman kept trying to walk away, the man was blocking her. *Id.* At approximately 10:56 p.m., another manager of Crabby Bill's called Pinellas County Sheriff's Deputy Christopher Cook to report an alleged domestic disturbance. Doc. 45 ¶1; Doc. 34-3 ¶3; Doc. 34-4 at 14. After receiving this information, Deputy Cook drove towards Crabby Bill's and contacted the Pinellas County Sheriff's Office ("PCSO") dispatch to advise of a "34 in progress"—a "domestic incident"—and that he had just received a call from a manager, who reported seeing "a guy striking his girlfriend." Doc. 34-3 ¶3; *see* Doc. 45 ¶2; Doc. 34-2 at 15:21–23; Def. Exhibit D.[2] Dispatch advised that it would send backup. Doc. 34-3 ¶3.

---

[2] Defendants' Exhibit D is an audio recording of Cook's call with dispatch. Because this item is a CD, the Court refers to the exhibit number, not the CM/ECF document number.

In her September 13, 2019 Internal Affairs Division ("IAD") statement, Cindy stated that she left Crabby Bill's by herself around 11:00 p.m. because she decided that she "wanted to leave and go home." Doc. 34-8 at 30. In her deposition, she stated that she left the restaurant right after the group arrived because she wanted to leave. Doc. 53-1 at 29:1–10. Without saying goodbye to anyone, she began walking back to the hotel. Doc. 34-8 at 30; Doc. 53-1 at 29:11–14.

According to Cindy, Paul left the restaurant, saw that she was leaving, and inquired where she was going, to which she replied, "I am done" and "I am going home." Doc. 34-8 at 30. She also testified that Paul, while holding her hand, asked her to return to the restaurant so that they could say goodbye to everyone and leave together, but she declined and "tried to walk away." *Id.*; Doc. 53-1 at 37:13–24, 38:1–5. Paul asked her several more times while holding her hand or wrist. Doc. 34-8 at 30; Doc. 53-1 at 38:6–10. Cindy and Bill stated in their IAD statements that Cindy called Bill's cellphone to ask Bill to take Paul back inside the restaurant. *Id.* at 19, 30. As such, Bill left the restaurant to "walk up the street to get Paul." *Id.* at 19. Upon walking out of the restaurant's bathroom, Bonett noticed Bill leaving the restaurant and went outside to see why Bill was leaving because he was "curious." Doc. 34-7 at 60:11–18, 64:8–16.

Cook arrived at Crabby Bill's at, or after, 10:58 p.m. Doc. 34-2 at 16:16–17; Doc. 34-3 ¶4. He was wearing his dark green PCSO uniform, which included a badge on his chest, patches on his sleeves, and a utility belt with his gun, a bright yellow taser, handcuffs, and a baton. *Id.*

4

*ii. Surveillance Video and Audio Recording*

Several video files and audio files are in evidence, including: (1) a parking lot surveillance video from Crabby Bill's (Def. Exhibit J); and (2) an audio recording from Paul's phone (Def. Exhibit L).[3]

### 1. Surveillance Video

The parties agree that the surveillance video from Crabby Bill's depicts Paul, Cindy, Bill, Cook, and Bonett. Doc. 45 ¶4. The video does not include any audio. The video shows a man in a red shirt and a woman in a blue shirt walking on a sidewalk at 10:57:06 p.m.[4] Def. Exhibit J at 00:12. The parties agree that this sidewalk runs alongside 4th Avenue, that 4th Avenue intersects with 1st Street, and that these individuals are Paul and Cindy. Doc. 34 at 4–5; Doc. 44 at 4–5. Before Cindy and Paul reach the intersection of 4th Avenue and 1st Street, Cindy yanks her arm out of Paul's grip. Def. Exhibit J at 00:21. Paul grabs her arm again as the two of them cross 1st Street. *Id.* at 00:21-00:24. The two of them appear to be talking for over a minute in the intersection of 4th Avenue and 1st Street, or just past the intersection, but palm trees and shrubbery mostly obstruct them. *Id.* at 00:24–01:43. Cindy then starts walking further down the sidewalk, but Paul stands in front of her. *Id.* at 01:43–02:19.

Beginning at 10:59:12 p.m., the video depicts an individual walking down the sidewalk towards them. *Id.* at 02:05. The parties agree that this individual is Bill. Doc.

---

[3] Because these items are CDs, the Court refers to the exhibit number, rather than the CM/ECF document number.

[4] When stating the time, the Court refers to the video's timestamp.

35 at 5; Doc. 44 at 5. The video shows Bill walking up to Paul and Cindy, who are standing on the sidewalk that runs alongside 4th Avenue, just on the other side of 1st Street. Def. Exhibit J at 2:05–02:31. At this point, two individuals in the restaurant's parking lot look in their direction. *Id.* at 02:31–02:45. At 10:59:38 p.m., Paul, Cindy, and Bill cross 4th Avenue and begin walking on the sidewalk that runs alongside the other side of 4th Avenue. *Id.* at 02:31–03:03. Paul has his right arm bent towards his head, which he appears to hold as he crosses 4th Avenue, but whether he holds a cellphone is unclear. *Id.* at 02:28–02:33. At 10:59:55 p.m., after Paul, Cindy, and Bill have crossed 4th Avenue, the video depicts an individual in dark clothing, whom the parties agree is Cook, Doc. 34 at 5–6; Doc. 44 at 5–6, running in their direction, Def. Exhibit J at 02:48–03:02. Seconds later, at 11:00:04 p.m., an individual in a white shirt appears on screen, walking down 4th Avenue, in the same direction as Paul, Cindy, Bill, and Cook. *Id.* at 02:57–03:13. The parties agree that this individual is Bonett. Doc. 34 at 10 n.7; Doc. 44 at 7. The video concludes at 11:00:20 p.m., with Bonett in the intersection of 4th Avenue and 1st Street. Def. Exhibit J at 03:14. Cook, Paul, and Cindy are not visible when Bonett reaches the intersection. *Id.*

## 2. Audio Recording From Paul's Phone

The parties agree that the audio recording at Defendants' Exhibit L is from Paul's phone. Doc. 34 at 10 n.7; Doc. 44 at 7–8. This recording is 40 seconds long. In the recording, an individual says, "Who are you?" Def. Exhibit L at 00:03. Another individual says, "We're good. We're good." *Id.* at 00:06. Seconds later, an individual twice says, "Don't grab me again." *Id.* at 00:15–00:20. This person also says, in part,

6

"You're not going to tase—" after someone says, in part, "Tase you—." *Id.* at 00:22–00:25. At this point, a woman states, "We are fine." *Id.* at 00:26. The individual who warned against grabbing then asks, twice, "For what reason?" *Id.* at 00:28–00:30. Next, the woman says, "We're fine. We're almost home." *Id.* at 00:31–00:32. The individual who warned against grabbing then states, "Yo, Jack, it's Paul. Give me a call back when get a minute." *Id.* at 00:33–00:37. The audio recording concludes with the woman yelling, "No!" *Id.* at 00:38–00:40.

### iii.   *Different Accounts of Events Leading Up to Bonett's Arrest*

The parties' accounts of events leading to Bonett's arrest vary. Before examining those differing accounts, the Court highlights a few undisputed facts. First, the parties agree that Cook caught up with Paul and Cindy. Doc. 34-3 ¶9; Doc. 34-2 at 29:2–4, 18–24; Doc. 34-7 at 97:23–25, 98:1–11, 377. At some point during Cook's encounter with Paul and Cindy, Cook tased Paul. Doc. 34-2 at 55:21–25, 56:1–2; Doc. 34-4 at 11; Doc. 34-7 at 156:2–7; Doc. 44-6 ¶12. Additionally, at some point, Bonett was in the vicinity of Cook, Paul, and Cindy. *See* Doc. 34-2 at 39:9–25, 40:15–19; Doc. 34-4 at 11; Doc. 34-7 at 95:4–7. The parties do not dispute that Bonett's shirt was removed at some point. Doc. 34-2 at 38:10–13, 39:14–21; Doc. 34-4 at 11; Doc. 34-7 at 136:24–25, 137:1, 142:18–22; Doc. 44-6 ¶15. The parties agree that the area near the Indian Rocks Historical Museum was very dark, that Bonett never touched Cook, and that Cook arrested Bonett for Assault on a Law Enforcement Officer. Doc. 34-2 at 85:6–7; Doc. 34-3 ¶10; Doc. 34-7 at 90:14–19; Doc. 45 ¶5. Further, the evidence reveals no dispute that Cindy was arrested for Battery on a Law Enforcement Officer or that Paul

was arrested for Resisting an Officer with Violence and Domestic Battery. Doc. 34-20 at 2–3; Doc. 34-3 ¶27; Doc. 34-4 at 12. The State Attorney concluded that the facts and circumstances did not warrant prosecuting Bonett. Doc. 34-8 at 42.

### 1. Cook's Account of Events

Upon Cook's arrival, Anderson informed him that he had seen a bald adult male wearing a red shirt push an adult female wearing a blue shirt, and he pointed out the couple at the corner of 4th Avenue and 1st Street, who were later identified as Paul and Cindy. Doc. 34-3 ¶5; Doc. 34-4 at 11, 14. Cook "heard raised voices coming from" where Paul and Cindy were located, Doc. 34-3 ¶6, and heard and saw "the gentleman in the red shirt yelling at the female in the blue shirt," but he could not hear what Paul was yelling, aside from expletives, Doc. 34-2 at 18:16–25, 19:1–4.

Cook started to walk towards them. Doc. 34-3 ¶6; Doc. 34-4 at 11. Paul and Cindy crossed 4th Avenue. Doc. 34-3 ¶7. Cook started running in their direction, and Paul and Cindy turned left on 4th Avenue and headed towards the Indian Rocks Historical Museum. *Id.* In his initial report, Cook stated that the male and female began walking towards 4th Avenue and 2nd Street upon seeing him. Doc. 34-4 at 11. He also stated that he called out to them and ordered them to stop, but the male looked at Cook in acknowledgement and began walking faster to evade him. *Id.* Similarly, in his affidavit, Cook testified that he believed that Paul and Cindy were trying to evade him because they did not stop in response to his commands. Doc. 34-3 ¶8. Cook testified that, at the point when he first appeared on the surveillance video, when Paul, Cindy, and Bill had crossed 4th Avenue and were heading towards 2nd Street, he was

yelling, "Stop, Sheriff's Office," towards them. Doc. 34-2 at 21:17–25, 22:1–5; *see* Doc. 34-3 ¶8.

Cook caught up with Paul and Cindy on the sidewalk near the Indian Rocks Historical Museum. Doc. 34-3 ¶9; Doc. 34-2 at 29:2–4, 18–24. No other law enforcement officers or "uninvolved" civilians were in this dark area. Doc. 34-3 ¶10; Doc. 34-2 at 49:13–22, 53:13–15. Cook ordered Paul to stop walking away and said that he needed to conduct an investigation about a domestic dispute. Doc. 34-4 at 11. He told them that he had instructed them to stop. Doc. 34-3 ¶11. Both Cook's initial report and his affidavit indicate that Cook attempted to take Paul's arm because he was not stopping and that Cook was met with resistance. *Id.*; Doc. 34-4 at 11. According to the initial report, Cook "gave Paul a custodial touch on his left arm and gave him another lawful order to stop walking," Paul pushed his arm away, Cook "placed [his] right arm on [Paul's] left arm again," and Cindy pushed Cook's arm away "in a forceful manner." Doc. 34-4 at 11. In his affidavit, he states that he attempted to grab Paul's arm to "detain him" and that Paul "actively resisted and kept walking." Doc. 34-3 ¶15.

Cook's initial report and deposition testimony place Bonett at the scene before Cook tased Paul. Cook stated in the report that, once he caught up with Paul and Cindy but before he grabbed Paul, Bonett and Bill approached him, both of whom, in addition to Paul and Cindy, smelled of alcohol and appeared to be intoxicated. Doc. 34-4 at 11. After Cindy pushed Cook's arm away and Paul continued walking, Cook stated that he stepped in front of Paul to deter him from walking any further. *Id.* At

this point, according to the report, Bonett removed his shirt and began approaching Cook in a hostile manner with his fists clenched. *Id.* Paul also approached in a hostile manner. *Id.* Similarly, in his deposition, Cook stated that he first became aware of Bonett after he pushed Paul's shoulder a second time because Bonett took his shirt off. Doc. 34-2 at 33:18–21, 39:11–13. Cook testified that he could not recall seeing Bonett walk up; the first thing he noticed was Bonett taking his shirt off. *Id.* at 39:8–13. According to Cook's deposition, Bonett, who was approximately three to five feet away from Cook when he removed his shirt, was yelling expletives at Cook while removing the shirt and stating that he was a Philadelphia police officer. *Id.* at 38:10–13, 39:14–21. In his deposition, Cook could not recall whether he was standing in the grass, on the sidewalk, or in the road when Bonett removed his shirt, but he faced west, while Paul and Bonett faced east. *Id.* at 34:2–15. Cook also could not recall "how specifically [Bonett] took his shirt off," nor could he recall any details about the shirt, aside from the shirt being a short-sleeve shirt. *Id.* at 35:14–25, 26:1. Although he mentioned Bill in his report, he could not recall whether Bill was with Paul and Cindy, nor could he recall where Bill was located when Bonett removed his shirt. *Id.* at 24:4–16, 35:5–6. He also could not recall Bill holding onto Bonett. *Id.* at 75:8–10.

Cook's report, deposition testimony, and affidavit indicate that Paul continued to advance. Doc. 34-4 at 11; Doc. 34-2 at 48:11–13; Doc. 34-3 ¶19. According to Cook's initial report and deposition testimony, Bonett also advanced towards him. Doc. 34-4 at 11; Doc. 34-2 at 39:9–25, 40:15–19. Cook's report stated that: he drew his taser because Paul approached him in a hostile manner; he pointed the taser at Paul

and Bonett, ordering them to stop approaching him; and that he tased Paul because Paul continued to advance, while Bonett was yelling with his fists clenched. Doc. 34-4 at 11. Cook did not mention pointing his taser at Bonett in either his deposition or his affidavit. During his deposition, Cook stated that he informed Paul and Bonett that they needed to back away from him after Bonett removed his shirt, repeatedly said expletives, and identified himself as a Philadelphia police officer. Doc. 34-2 at 39:9–25, 40:15–19. In response, Bonett and Paul assumed aggressive postures, staggered their stances, clenched their fists, continued to yell expletives at Cook, and closed the distance between them and Cook. *Id.* at 43:5–25. At this point, Cook testified, he was backing up eastbound, off the sidewalk and into 2nd Street. *Id.* at 45:3–10, 46:24–25, 47:1–8. During his deposition, Cook testified that Bonett stopped advancing when Cook was in 2nd Street and that Paul continued to advance. Doc. 34-2 at 52:10–13, 53:1–7, 55:13–25, 56:1–2. In his report, Cook stated that Bonett was "continually 5-10 yards away" from Cook, whereas Cook stated during his deposition that Bonett was approximately five feet away after he stopped advancing, Doc. 53:1–7.

Cook's report and deposition testimony indicate that he warned Paul that he would tase him. Doc. 34-2 at 55:21–25 Doc. 34-4 at 11. Because Paul continued to advance, Cook tased him. Doc. 34-2 at 55:21–25, 56:1–2; Doc. 34-4 at 11. The taser was ineffective, however, as Paul pulled the prongs out of his arm and continued walking away. Doc. 34-2 at 55:6–9; Doc. 34-4 at 11. During his deposition, Cook testified that two individuals who had disregarded his commands were walking in front of him, while Bonett was behind him, with the entire group moving southbound. Doc.

11

34-2 at 57:3–22. Cook testified that he focused on Paul since he was the suspect in a battery investigation, yet he was unable to detain Paul "due to the threat of" Bonett approximately five yards behind him, who continued to clench his fists and approach in an aggressive manner. *Id.* at 59:6–15. When the group reached a park bench, Paul turned towards Cook, staggered his stance, clenched his fists, and again approached in an aggressive manner, while Bonett, who was approximately five to seven yards away, continued to approach in an aggressive manner. *Id.* at 59:21–24, 60:18–25, 61:1–8. Cook's report and his deposition testimony indicate that Cook took Paul to the ground, which resulted in some type of aggressive action from Bonett. In his report, Cook stated that Bonett "proceeded to rush towards [him] in a hostile manner." Doc. 34-4 at 11. During his deposition, Cook stated that Bonett yelled, "You done f****d up" and approached Cook aggressively. Doc. 34-2 at 61:18–20, 63:5–11. Backup units then arrived. Doc. 34-2 at 61:21–25.

Cook's affidavit describes events more broadly. There, Cook explained that he backed up in a defensive posture to create distance between him, Paul, and Cindy, in accordance with his training to avoid an attack, after he repeatedly attempted to take Paul's arm to detain him. Doc. 34-3 ¶¶15–16. However, Paul and Cindy continued walking towards him. *Id.* at ¶16. He smelled alcohol on their breath and, based on their appearance and how they acted believed they were intoxicated. *Id.* at ¶14. Cook was "very concerned" for his own safety, as he is trained to recognize "pre-attack indicators," which "include subjects advancing and closing the distance between them and an officer, despite the officer retreating." *Id.* at ¶17. Cook's training in the Tueller

12

Drill and Reactionary Gap taught him that a subject can close the distance of 21 feet in less than two seconds. *Id.* Cook stated that he "was in a position of disadvantage and felt threatened" because the backup had not yet arrived and he "was alone in the dark, outnumbered by potentially armed people, who might be law enforcement and, thus, trained in uses of force, and who [he] believed were intoxicated." *Id.* at ¶18.

After mentioning that Paul and Cindy continued to advance, Cook stated in his affidavit that he deployed his taser to stop "them" from advancing. *Id.* at ¶19. After discussing the taser and its ineffectiveness, Cook stated generally in his affidavit that Bonett "appeared within 5 feet" of him "[w]hile [he] was interacting with Paul and Cindy." *Id.* at ¶20. The affidavit does not explicitly state that Bonett was present before, or when, Cook tased Paul. Cook described Bonett as "clearly upset." *Id.* According to the affidavit, Bonett advised him that he was a Philadelphia police officer, and Cook smelled alcohol on his breath. *Id.* Cook believed that he was intoxicated. *Id.*

Cook also stated in the affidavit that Bonett was wearing a shirt at this time, but "suddenly his shirt was removed over his head." *Id.* at ¶21. The affidavit does not address how Bonett's shirt was removed or who removed Bonett's shirt, but stated that removal of a subject's shirt during an interaction with police qualifies as a "pre-attack indicator." *Id.* at ¶21. According to Cook, he was "already feeling threatened by the extremely chaotic scene when [Bonett] suddenly appeared within 5 feet of [him] with his shirt removed." *Id.* at ¶22. He was now "at an even greater disadvantage" because he was alone, in the dark, outnumbered, and waiting for back up, with possibly armed and trained people, who had been drinking, standing in front of him and beside him,

and "the shirt of one of them [had been] removed." *Id.* Cook explained that Bonett's sudden appearance within five feet of him in a dark and isolated area during a chaotic encounter, followed by the removal of Bonett's shirt, caused him to fear for his safety and believe that Bonett would attack him. *Id.* Cook needed to stagger his stance with his hands up to protect himself as a result of "the threat of multiple, possibly armed and trained, people who clearly had been drinking, within a close proximity to [him] from the front and the side." *Id.* at ¶23. He tried to blade his body so that his "gun side" was turned away from them. *Id.* Although Cook wanted to arrest Paul for domestic battery and resisting arrest, he did not believe that he could successfully take Paul into custody once Bonett appeared with his shirt removed, so he waited for the backup to arrive. *Id.* at ¶25. Cook's report indicated that he arrested Bonett for Assault on a Law Enforcement Officer due to Bonett "taking off his shirt and approaching [Cook] repeatedly in a hostile manner while yelling expletives which caused a well-founded fear of bodily harm . . . ." Doc. 34-4 at 12.

## 2. Bonett's Account of Events

After leaving Crabby Bill's, Bonett turned onto 4th Avenue and saw that Bill was approaching 1st Street. Doc. 34-7 at 75:12–16. He did not see Paul or Cindy. *Id.* at 75:16–17. Before 1st Street, Cook ran within five feet of Bonett, who was walking in the same direction on 4th Avenue. Doc. 34-7 at 78:12–18, 79:7–14, 80:7–8. Because of Cook's dark green uniform, Bonett figured that Cook could have been security or law enforcement. *Id.* at 86:16–25, 87:18–23; *see* Def. Exhibit I-1 at 30:57–31:02. Cook did not yell "stop" or "police" as he passed Bonett. Doc. 44-6 ¶10. Bonett heard a

14

commotion as he crossed 1st Street and when he was within five to ten feet from the scene. Doc. 34-7 at 103:10–17, 105:5–10.

Bonett came across everyone before the intersection of 4th Avenue and 2nd Street, near the Indian Rocks Historical Museum. *Id.* at 97:23–25, 98:1–11, 377. He was "within 5 to 10 feet of everybody." *Id.* at 95:4–7. At this point, Bonett was standing "on the sidewalk area." *Id.* at 109:18–20. He knew that Cook was a law enforcement officer upon arriving at this location. *Id.* at 88:20–25, 21:1–21. The first thing Bonett noticed when he arrived was that Paul had a taser prong in his arm, and he saw Paul remove the prong. *Id.* at 115:1–3. He did not witness Cook's deployment of the taser. *Id.* at 156:2–7; Doc. 44-6 ¶12. He was within approximately five to ten feet of Deputy Cook for "probably not even three seconds." Doc. 34-7 at 119:9–15. According to Bonett, this distance was "the closest that [he] ever got to Deputy Cook at all." *Id.* at 119:9–12. Cook was in front of Bonett, but Bonett was behind everyone else. *Id.* at 119:16–18. Seeing a taser prong in Paul's arm, Bonett said to Cook, "What are you doing? You're out of control. We're all law enforcement." *Id.* at 116:7–14, 118:1–6, 121:6–11, 122:9–11. He testified that he was "confused" and "could have been upset." *Id.* at 137:5–11.

Bonett testified that Bill, who stood in front of him, grabbed Bonett's inner biceps when he said this remark to Cook. *Id.* at 116:7–15, 137:12–14, 140:1–13. He estimated that Cook was still five or ten feet, or "probably about" five feet, away from him at this time. *Id.* at 111:2–3, 137:15–22. Bonett testified that he wore a baggy shirt

15

that evening. *Id.* at 135:11–17. Because Bill's hold on Bonett's inner biceps hurt, Bonett "went down and away" as a "natural reaction," which resulted in his shirt coming off in Bill's hands. *Id.* at 135:11–22, 136:2–8, 142:4–7. As such, Bonett denied taking his shirt off. *Id.* at 136:24–25, 137:1, 142:18–22; Doc. 44-6 ¶15. He also denied pulling off his shirt "as if [he] was getting ready to fight." Doc. 44-6 ¶17. He testified that Bill was not holding him back. Doc. 34-7 at 141:25, 142:1–3. He denied using profanity when he was near Cook or when Bill grabbed him. *Id.* at 147:11–24. In a subsequent recorded call from the Pinellas County Jail, Bonett stated that he probably would not have been arrested if Bill did not "rip [his] shirt off," which "made it look like more than what it was," Def. Exhibit N-1 at 06:48–07:10, and that he would not have been "locked up" if Bill did not take off his shirt, Def. Exhibit N-2 at 06:33–06:37.[5] He stated that "all [he] was trying to do was make sure it didn't get worse than what it was." Def. Exhibit N-1 at 09:11–09:14.

After Bill grabbed Bonett, Paul and Cindy "just walked away," entered the nearby park area, and Paul sat on a bench. *Id.* at 116:7–18, 176:24–25, 177:1. Bill and Bonett "stayed together" and were located approximately ten to fifteen feet "off" of Fourth Avenue and "before" Second Street, in the vicinity of a ramp to the Indian Rocks Museum, but they never passed the ramp. *Id.* at 107:13–25, 108:1–5, 154:19–25, 157:11–22, 167:1–24, 377. Bonett never stepped onto 2nd Street. *Id.* at 156:19–20. Bonett estimated that he was around 40 feet away from Paul, Cindy, and Cook. *Id.* at

---

[5] At the Court's direction (Doc. 57), Cook and Gualtieri provided new copies of Exhibits N-1 and N-2 because the original versions of those exhibits did not play. *See* Doc. 58.

155:13–22. According to Bonett, Paul sat on the bench and Cindy stood "above" Paul. *Id.* at 146:15–22. When the backup officers arrived, Bonett observed Cook walk closer to Paul and Cindy, push Cindy out of the way, and the backup officers subdued Paul. *Id.* at 174:10–15. While the officers subdued Paul, Bonett said, "You're beating up my f******g brother-in-law." *Id.* at 147:1–5, 153:2–5. After they subdued Paul, the officers placed Bonett in handcuffs. *Id.* at 174:10–22.

Bonett denied clenching his fist towards Cook, balling up his fists, advancing towards him, approaching him in a threatening manner, threatening him, yelling at him, getting within five feet of him, or cursing at him. Doc. 34-7 at 306:6–11, 25, 307:1–12; Doc. 44-6 ¶13. He also denied advancing upon Deputy Cook as Cook backed up from the area surrounding the Indian Rocks Historical Museum, across a grassy yard, a sidewalk, and onto 2nd Street, to which Cook testified in his deposition. Doc. 44-6 ¶17.

### 3. <u>Other Accounts</u>

During her deposition, Cindy testified, in relevant part, that Bonett did not arrive to the scene until after the tasing, stating her belief that he arrived after she and Paul walked to the bench, but before Cook "beat" Paul. Doc. 53-1 at 87:2–17, 96:22–24,97:1–2. She could not recall Bonett's location when she first saw him, but she remembered seeing and hearing him. *Id.* at 98:1–11. According to Cindy, Bonett and Bill were "behind" her after Cook pushed her out of the way, describing the distance as "pretty far back," "probably 20 feet behind," and "maybe 20, 25 feet maybe." *Id.* at 96:17–19, 105:8–12, 203:21–24, 204:1–3.

Cindy also testified that Bonett yelled about Cook beating Paul from that distance. *Id.* at 98:19–24, 99:1–6, 103:4–24, 104:1–2. She stated that Bonett yelled, "Why the f**k are you beating him?" and similar statements. *Id.* at 99:7–14. She described Bonett as "very emotional" and explained that seeing "his brother-in-law getting beaten was emotional for him." *Id.* at 99:11–17. She testified that Bonett "never got anywhere near" Cook during this interaction. *Id.* at 105:13–16. She first noticed that Bonett's shirt was off when the officers placed her and Bonett in the back of a police cruiser. *Id.* at 101:9–11. She did not know how Bonett's shirt came off because he was behind her. *Id.* at 101:3–5, 23–24, 102:1–2.

In his IAD statement, Bill stated that Bonett "showed up on the scene" after Cook tased Paul. Doc. 34-8 at 19. According to Bill, Paul and Cindy walked towards the hotel after the ineffective taser deployment, but Bill was "momentarily distracted" at this point because he was "dealing with" Bonett. *Id.* at 20. He stated that he held Bonett by his shirt "to attempt to calm him down because he was very upset that he observed" Cook jumping on and striking Paul. *Id.* Bonett's "shirt came off" as Bill "was holding him." *Id.*

### B. Procedural Background

Bonett initiated this action in the Circuit Court for the Sixth Judicial Circuit, in and for Pinellas County, Florida. Doc. 1 at 1. Cook and Gualtieri removed the action. After the Court dismissed Bonett's complaint as a shotgun pleading, Bonett filed the Amended Complaint, which, at that time, consisted of four claims for damages: (1) a

claim against Cook in his individual capacity under 42 U.S.C. § 1983 for violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution as a result of his false arrest; (2) a claim against Cook in his individual capacity under 42 U.S.C. § 1983 for violation of his rights under the Fourteenth Amendment as a result of his false imprisonment; (3) a claim for false arrest against Gualtieri, in his official capacity as Sheriff of Pinellas County; and (4) a claim for false imprisonment against Gualtieri, in his official capacity as Sheriff of Pinellas County. Doc. 17 ¶¶1, 3, 14–16, 18–22, 24, 27–28, 30, 34.

In granting-in-part and denying-in-part Cook and Gualtieri's motion to dismiss, the Court granted the motion as to Count I to the extent that Bonett premised that claim upon a violation of the Fourteenth Amendment, granted the motion as to Count II and dismissed that claim with prejudice, and denied the motion in all other respects. Doc. 35 at 24. Cook and Gualtieri now seek summary judgment (Docs. 34, 36).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show

the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).[6] Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   ANALYSIS

The Court will address Cook's motion before addressing Gualtieri's motion. For the reasons set forth below, the Court will grant Cook's motion and grant Gualtieri's motion.

---

[6] Unpublished decisions of the Eleventh Circuit are not binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2.

### A. The Court Will Grant Cook's Motion for Summary Judgment

In Count I, Bonett alleges that Cook lacked probable cause to arrest him and falsely arrested him. Doc. 17 ¶¶13–14. As such, he premises this claim upon a violation of the Fourth Amendment. *Id.* ¶15. Cook argues that he is entitled to qualified immunity on Bonett's sole claim against him under 42 U.S.C. § 1983 because at least arguable probable cause existed for Bonett's arrest.[7] Doc. 34 at 18–25. For the reasons set forth below, Cook is entitled to summary judgment on this claim.

To receive qualified immunity, Cook must "first establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal quotation marks omitted). "A governmental official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties; and (2) within the scope of his authority." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017). In applying each prong of this test, the Court "look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). In other words, the Court "'must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's

---

[7] Cook has raised qualified immunity, probable cause, and arguable probable cause as affirmative defenses. Doc. 43 at 9.

discretionary duties.'" *Mikko*, 857 F.3d at 1144 (original emphasis removed) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

If Cook establishes that he acted within his discretionary authority, the burden shifts to Bonett to demonstrate that qualified immunity is inappropriate. *Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015). In that event, Bonett must satisfy this two-pronged inquiry: (1) whether the facts that he has shown "make out a violation of a constitutional right"; and (2) whether the right at issue was "clearly established" at the time of Cook's alleged misconduct. *Gilmore v. Hodges*, 738 F.3d 266, 267 (11th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court may address either prong first. *See Pearson*, 555 U.S. at 236.

In the qualified-immunity analysis, the Court must resolve all issues of material fact in favor of Bonett, and then determine the legal question of whether Cook is entitled to qualified immunity under that version of the facts. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017) (internal quotation marks omitted). With the facts construed in this manner, the Court "ha[s] [Bonett's] best case" and "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity." *Id.* (internal quotation marks omitted). Thus, at the summary-judgment stage, once the Court has "determined the relevant set of facts and drawn all inferences in favor of" Bonett to the extent supportable by the record, the reasonableness of Cook's actions "is a pure question of law." *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (internal quotation marks omitted and original emphasis removed).

22

Thus, the Court must first examine whether Cook acted within the scope of his discretionary authority. The conduct of which Bonett complains in Count I is Cook's arrest of him without probable cause. "A police officer generally acts within the scope of his discretionary authority when making an arrest." *McDowell v. Gonzalez*, 820 F. App'x 989, 991 (11th Cir. 2020) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Placing aside the fact that Cook may have committed the arrest for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances, Cook's arrest of Bonett constitutes an act undertaken in accordance with the performance of Cook's duties as a deputy sheriff, and the arrest was within, or reasonably related to, the outer perimeter of Cook's discretionary duties as a deputy sheriff. *See Maughon v. City of Covington*, 505 F. App'x 818, 822 (11th Cir. 2013).

As Cook highlights, Doc. 34 at 19, Bonett also alleges that Cook acted "pursuant to his authority as a deputy sheriff" at "all times material to this" action, which includes the alleged false arrest, Doc. 17 ¶4. And in responding to Cook's motion, Bonett does not argue that Cook acted outside the scope of his discretionary authority or otherwise challenge Cook's assertion that he acted within his discretionary authority. *See Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) ("The parties do not dispute that Johnson and Crutchfield were acting in a discretionary capacity. Accordingly, the burden shifts to Sherrod to show that Johnson and Crutchfield are not entitled to qualified immunity."); *Morris v. Dean*, 223 F. App'x 937, 938 (11th Cir. 2007) ("Because the parties do not dispute that Trooper Dean was

acting within his discretionary authority, we must consider whether Trooper Dean violated a clearly established constitutional right."). For all of these reasons, Cook acted within the scope of his discretionary authority when he arrested Bonett.

Because the Court finds that Cook acted within the scope of his discretionary authority when he arrested Bonett, the burden shifts to Bonett to show facts establishing a violation of a constitutional right that was clearly established at the time of Cook's alleged misconduct. Cook argues that Bonett cannot carry his burden because Cook had probable cause, or at least arguable probable cause, to arrest him for assault or obstruction of justice under Florida law. Doc. 34 at 19. A warrantless arrest lacking probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim. *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). But if probable cause supports Cook's arrest, it acts as an "absolute bar" to Bonett's § 1983 claim for false arrest. *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016).

To determine whether an officer had probable cause for an arrest, a court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (internal quotation marks omitted). "Probable cause is not a high bar." *Id.* (internal quotation marks omitted). "The totality of the circumstances requires courts to consider the whole picture," as "the whole is often greater than the sum of its parts—especially

24

when the parts are viewed in isolation." *Id.* at 588 (internal quotation marks omitted). "[T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (internal quotation marks omitted). To receive qualified immunity, Cook need have only arguable probable cause, not actual probable cause. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed to arrest." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (internal quotation marks and alterations omitted) (original emphasis removed).

In support of his qualified-immunity argument, Cook asserts, in relevant part, that a reasonable officer could have believed that Bonett "was imminently going to attack him" when Bonett appeared "within 5 feet of him and his shirt was removed" during a "chaotic event," in "volatile circumstances," and "in a very dark and isolated area with no witnesses." Doc. 34 at 24. Cook emphasizes that he was in fear of his safety and believed that Bonett "was about to attack him" when he saw that Bonett's shirt "was suddenly removed while [Bonett] was within 5 feet of him, in a very dark and isolated area during a very chaotic encounter . . . ." *Id.* at 23.

Describing Cook's motion and Gualtieri's motion as "essentially mirror images" of each other while conceding that only Cook addresses the federal claim, Bonett addresses those motions collectively. Of course, he brings only one federal claim against Cook, while he sues Gualtieri under state law, and, as a result, only Cook

25

raises qualified immunity. Bonett devotes his response to arguing that disputes of fact exist. He begins by asserting that the "first, last and most important question" for the Court is, "[A]re the material facts in dispute?" Doc. 44 at 1. From there, he highlights "diametrically opposite" and "competing version[s] of the events," points to purported conflicts in testimony and evidence, and discusses facts supposedly omitted from Cook's motion. *See id.* at 1–12. As such, he concludes that "the motion for summary judgment should be denied" because the "material facts of [his] arrest are in dispute." *Id.* at 13.

But, as explained above, "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment" based upon qualified immunity. *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see Golston by Golston v. Vance*, 789 F. App'x 845, 847 (11th Cir. 2020) ("But when a defendant raises qualified immunity, a district court cannot simply deny that defendant's summary judgment motion because the facts are disputed."). Rather, in analyzing Cook's assertion of qualified immunity, the Court must resolve issues of material fact in Bonett's favor and determine qualified immunity under that version of the facts. *Stephens*, 852 F.3d at 1313. As such, contrary to Bonett's assertion, any disputed issues of fact do not warrant denying Cook's motion. Therefore, Bonett's basis for arguing that the Court must deny Cook's motion fails.

Relatedly, because he focuses on material facts in dispute, he fails to carry his burden of demonstrating facts establishing a violation of a constitutional right that was clearly established at the time of Cook's alleged misconduct. He does not address the

Fourth Amendment. Indeed, he does not cite to any legal authority, let alone legal authority to support a clearly established constitutional violation. He mentions probable cause only in passing. First, he states that Cook's motion and Gualtieri's motion argue that Cook had probable cause to arrest Bonett and contains a "dense recitation of case law" on probable cause. Doc. 44 at 2. Later on, when discussing disciplinary records for Paul, he argues that those records "have no bearing on probable cause to arrest anybody" or on "Cook's alleged probable cause." *Id.* at 12. That's it. He does not mention probable cause again. The phrases "qualified immunity" and "arguable probable cause" do not even appear in the response. Bonett fails to carry his burden in the qualified immunity analysis. As such, Cook is entitled to summary judgment on Count I on this basis.

Cook is also entitled to summary judgment on Count I because resolving all issues of material fact in Bonett's favor shows that Cook had at least arguable probable cause to arrest Bonett for assault or obstruction of justice. At the time of Bonett's arrest, Florida law defined "assault" as "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Fla. Stat. § 784.011(1) (2019). Similarly, at the time of his arrest, Florida Statutes § 843.02, entitled "Resisting officer without violence to his or her person," provided: "Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . ." Fla. Stat. § 843.02

(2019). The two elements are: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So. 3d 1181, 1185–86 (Fla. 2009).

Reasonable officers in the same circumstances as Cook and possessing the same knowledge as him could have believed that probable cause existed to arrest Bonett for assault or obstruction of justice where: Bonett arrived to the dark scene where Cook interacted with Paul and Cindy; he immediately questioned Cook, identified himself as law enforcement, and told Cook that he was "out of control"; Bill grabbed Bonett and that Bonett's shirt somehow came off; and Bonet later said, "You're beating up my f******g brother-in-law." As such, Cook is also entitled to summary judgment on Count I on this basis.

### B.  The Court Will Grant Gualtieri's Motion for Summary Judgment

In Counts III and IV, Bonett alleges that Gualtieri, as the Pinellas County Sheriff, is a constitutional officer under the Florida Constitution and a state agency under Florida Statutes § 768.28. Doc. 17 ¶¶24, 30. In Count III, Bonett alleges that Gualtieri employed Cook, who, while acting within the course and scope of his employment, falsely arrested Bonett without probable cause, against Bonett's will and consent. *Id.* at ¶26. In Count IV, Bonett alleges that Cook caused him to be imprisoned in the Pinellas County Jail and that Cook's actions constitute false imprisonment because he lacked probable cause for this imprisonment. *Id.* at ¶¶32–33. In seeking summary judgment, Gualtieri argues that the Court must enter summary judgment in

his favor on both claims because Cook had probable cause to arrest Bonett. Doc. 36 at 2, 8–13. The Court agrees.

### i.   The Court Declines to Disregard Paragraph 13(3) of Bonett's Affidavit

First things first. In his reply, Gualtieri argues that the Court should disregard paragraph 13(3) of Bonett's affidavit as a sham because it contradicts Bonett's "clear deposition testimony." Doc. 56 at 6–7. In paragraph 13(3), Bonett states that, contrary to Cook's testimony, he did not "get within 5 feet" of Cook. Doc. 44-6 ¶13(3).[8] Gualtieri contends that Bonett repeatedly testified that "he got about 5 feet" from Cook. Doc. 56 at 6. Alternatively, Gualtieri contends that the Court can read Bonett's affidavit and deposition together as stating that Bonett "was as close at 5 feet from Deputy Cook, but not closer." *Id.* at 7.

Under the sham affidavit rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). In limited circumstances, a court may disregard an affidavit "when, without explanation, it flatly contradicts [the affiant's] own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none previously existed." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016). This rule operates only to "exclude unexplained

---

[8] In his affidavit, Cook stated that Bonett "appeared within 5 feet" of him. Doc. 34-3 ¶20.

discrepancies and inconsistences, as opposed to those which create an issue of credibility or go to the weight of the evidence." *Id.* (internal quotation marks omitted). Courts apply this rule "sparingly" due to the "harsh effect [it] may have on a party's case." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987).

The Court declines to disregard paragraph 13(3) of Bonett's affidavit. During his deposition, Bonett testified that he was "within 5 to 10 feet of everybody" when he walked up to the scene. *Id.* at 95:4–7. When asked whether he was "within" five yards of Cook, Bonett replied, "5 to 10 feet. That's the closest I ever got to Deputy Cook at all" and "[i]t was probably not even three seconds." *Id.* at 119:9–15. He also stated that Cook was five or ten feet, or "probably about" five feet, away from him when Bill grabbed him. *Id.* at 111:2–3, 137:15–22. Thus, Bonett described his distance from Cook in the form of a range (within five to ten feet) or, when discussing his distance when Bill grabbed him, as an approximation (five or ten feet, or "probably about" five feet).

Gualtieri does not argue that Bonett's deposition testimony provided clear answers to unambiguous questions negating the existence of a genuine issue of material fact. Rather, he states that Bonett's distance from Cook is "immaterial" since Cook knew from his training that Bonett "could cover 21 feet in less than 2 seconds" and that "removal of a shirt during an interaction with police is a pre-attack indicator." Doc. 56 at 7–8 (internal quotation marks omitted). Relatedly, because Bonett described his distance from Cook in the form of a range or approximation, the Court cannot conclude that Bonett's statement that he did not "get within 5 feet" of Cook "flatly contradicts" his earlier deposition testimony to create a genuine issue of

30

material fact where none existed before. *Cf. Bell v. City of Auburn*, 722 F. App'x 898, 900 (11th Cir. 2018) (holding that the district court did not err in disregarding portions of the plaintiff's declaration, in which he stated that he understood a comment to be racially discriminatory and that he complained of racial discrimination, where he previously testified during his deposition that he did not believe the comment was racial). Also, Gualtieri acknowledges that the Court can read Bonett's deposition testimony and affidavit together as stating that he was as close as five feet to Cook, but not closer. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1161 (11th Cir. 2012) ("If there were no way that Strickland's statements could be read together, perhaps Norfolk Southern would be correct and Strickland's affidavit could be disregarded as a sham."). Therefore, the Court rejects Gualtieri's request to disregard paragraph 13(3) of Bonett's affidavit.[9]

### ii. There is No Genuine Dispute of Material Fact That Cook Had Probable Cause to Arrest Bonett for Obstruction of Justice

Turning to the merits, Gualtieri argues that the Court must enter summary judgment in his favor because Cook had probable cause to arrest Bonett for obstruction of justice under Florida law.[10] Doc. 36 at 2, 8–13. The Fourth Amendment provides,

---

[9] In his deposition, Bonett testified that Cook ran within five feet of him while he walked on 4th Avenue. Doc. 34-7 at 78:12–18, 79:7–14, 80:7–8. The Court construes Bonett's statement about not getting within five feet of Cook at any time as pertaining to Bonett's arrival on the scene near the Indian Rocks Historical Museum. Regardless, whether Bonett was within five feet of Cook when Cook ran by him on 4th Avenue is not a material fact.

[10] In his reply, Gualtieri argues that Bonett fails to meet his summary-judgment burden because, despite Rule 56(c)(1), case law, and the Court's instructions, his response is "entirely argument, without cit[ation] to any statute or case law, and fails to present competent evidence in the record demonstrating disputed material facts." Doc. 56 at 2–3 (original

in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The action for false imprisonment is usually distinguishable in terminology only from the action for false arrest." *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944). "[U]nder Florida law, false arrest and false imprisonment are different labels for the same cause of action." *Rankin v. Evans*, 133 F.3d 1425, 1430 n.5 (11th Cir. 1998). Florida law defines "the largely synonymous torts of false arrest, false detention, and false imprisonment" as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty."

---

emphasis removed). Under Rule 56, a party asserting that a fact is genuinely disputed must support that assertion by citing to specific parts of materials in the record. Fed. R. Civ. P. 56(c)(1). The CMSO states that a party opposing a motion for summary judgment must file and serve "a legal memorandum with citation of authorities in opposition to" the requested relief. Doc. 12 at 6. Both the movant and the non-movant "shall provide pinpoint citations to the pages and lines of the record supporting each material fact. *Id.* To be sure, Bonett's response is a far cry from a model response. But, although he fails to cite to evidence in select portions of the response, other portions point to evidence in the record, including evidence that complies with Rule 56(c)(1)(4). He fails to cite to any legal authority, but Rule 56(c)(1) does not require him to do so. Also, while he fails to provide pinpoint citations in some portions, he provides pinpoint citations in other portions, such as when he addresses the surveillance video. Although he fails to provide pinpoint citations in select portions and fails to cite to legal authority, the Court declines to enter summary judgment in Gualtieri's favor as a result of any minor or partial violation of the CMSO. Rather, the Court elects to resolve Gualtieri's motion on the merits. The purpose of the CMSO's admonition for parties to provide pinpoint citations is to assist the Court in reviewing the record. Under Rule 56, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Here, the Court has reviewed the entire record, not only the cited materials. Thus, Gualtieri's argument is unavailing.

*Bartley v. Kim's Enter. of Orlando, Inc.*, 568 F. App'x. 827, 833–34 (11th Cir. 2014) (internal quotation marks omitted) (original emphasis removed).[11]

Qualified immunity serves as a defense to federal claims, not claims—like these two claims—arising under state law. *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995). Indeed, while a plaintiff who asserts a § 1983 claim bears the burden of showing the absence of probable cause, probable cause is an affirmative defense under state law. *Davis v. City of Apopka*, 734 F. App'x 616, 621 n.7 (11th Cir. 2018). "The existence of probable cause constitutes an affirmative defense to the claims of false arrest and imprisonment under Florida law." *Rankin*, 133 F.3d at 1436; *see Bolanos v. Metro. Dade Cnty.*, 677 So. 2d 1005, 1005 (Fla. 3d DCA 1996) ("[P]robable cause is a complete bar to an action for false arrest and false imprisonment . . . ."). Because "[p]robable cause is an affirmative defense to a claim of false arrest or false imprisonment," Gualtieri bears the burden of establishing the existence of probable cause to successfully assert this defense.[12] *Miller v. City of Jacksonville*, 603 So. 2d 1310, 1312 (Fla. 1st DCA 1992).

As highlighted above, to determine whether an officer had probable cause for an arrest, a court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable

---

[11] Indeed, false arrest and false imprisonment have nearly identical elements under Florida law. *See Manners v. Canella*, 891 F.3d 959, 975 (11th Cir. 2018) (listing the elements of false arrest under Florida law); *City of Boca Raton v. Basso*, 242 So. 3d 1141, 1143 (Fla. 4th DCA 2018) (listing the elements of false imprisonment under Florida law).

[12] Gualtieri has raised probable cause as an affirmative defense. Doc. 43 at 9.

officer, amount to probable cause." *Wesby*, 138 S. Ct. at 586 (internal quotation marks omitted). Not a high bar, probable cause simply requires a probability or substantial chance of criminal activity, rather than a showing of criminal activity. *Id.*; *see J.J. v. State*, 312 So. 3d 116, 119 (Fla. 3d DCA 2020) (en banc) (reciting this standard). "The totality of the circumstances requires courts to consider the whole picture," as "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* at 588 (internal quotation marks omitted); *see Hatcher v. State*, 342 So. 3d 807, 810 (Fla. 1st DCA 2022) (emphasizing that the court must consider "the whole picture"). "[T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." *Wesby*, 138 S. Ct. at 588 (internal quotation marks omitted); *see Weakley v. State*, 273 So. 3d 283, 286 (Fla. 1st DCA 2019) (reciting this principle).

Although some of Gualtieri's arguments focus on probable cause for assault, he also argues that Cook had probable cause to arrest Bonett for obstruction of justice. Doc. 36 at 8. Indeed, citing to cases discussing Florida Statutes § 843.02, Gualtieri asserts that Cook had probable cause to arrest Bonett for "obstruction of justice." Doc. 36 at 8 n.2. Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Wesby*, 138 S. Ct. at 584 n.2. Because the Court concludes that there is no genuine dispute of material fact that probable cause existed to arrest Bonett for obstruction of justice, it analyzes only obstruction of justice. The Court set forth the language of § 843.02 and explained the elements above. Gualtieri contends

34

that Cook had probable cause to arrest Bonett for "obstruction of justice," based upon the circumstances and the information then available to him, as a "prudent, cautious officer in Cook's situation would reasonably believe that, because of [Bonett's] actions, he could not take Paul into custody without backup." Doc. 36 at 13.

As emphasized above, the probable-cause analysis requires the Court to consider the "whole picture." Cook arrived at Crabby Bill's to investigate a domestic dispute. The evidence reveals no dispute about Cook's receipt of a call from a Crabby Bill's manager about a domestic disturbance or Anderson's identification of the couple at the corner of 4th Avenue and 1st Street (who were later identified as Paul and Cindy) as the people involved in the disturbance. Cook asserts that he believed that Paul and Cindy sought to evade him because they did not respond to his commands, including commands that he issued when he first appeared on the surveillance video on 4th Avenue. Bonett disputes that Cook yelled, "Stop" or "Police" as he ran by him.[13] Thus, Cook ran after Paul and Cindy, whom a witness described as being involved in a domestic dispute.[14]

---

[13] Bonett also argues that Cook's assertion in his report that, as he began walking towards Paul and Cindy, they began walking towards 4th Avenue and 2nd Street upon seeing him "simply did not happen" because the surveillance video shows Cook running, the video shows three people were in the group, and there is no indication from the video that they knew that Cook was near him, much less than they were trying to avoid him. Doc. 44 at 5–6. The Court agrees that the video depicts Cook running and three people in the group. However, it is not clear from Cook's report where Paul and Cindy were located when they supposedly saw him and began walking towards the intersection of 4th Avenue and 2nd Street. Further, the video lacks audio.

[14] Bonett provides an unsigned, unauthenticated IAD statement from Cook (Doc. 44-4). Gualtieri provides a signed, authenticated copy of this statement, in which Cook stated that he approached Paul and Cindy, who were "arguing in the intersection" and that he "told

Cook caught up with them in a very dark area, in which no other law enforcement officers or "uninvolved" civilians were located. Backup officers had not yet arrived. Cook's initial report and affidavit indicate that Paul offered resistance to Cook when Cook approached. Cook's initial report indicates that Paul pushed Cook's arm away when Cook tried to grab him, while Cook stated in his affidavit that Paul actively resisted when Cook tried to grab Paul's arm. Bonett contends that he did not arrive to the scene until after Cook tased Paul, but nonetheless points to the audio from Paul's phone in an unpersuasive attempt to "disprove[] [Cook's] claims" in the report and deposition. Doc. 44 at 8.[15]

---

them they needed to move and stop arguing." Doc. 34-8 at 15–17. Bonett argues that this "alleged event never took place" because the surveillance video shows that Cook did not approach anyone in the intersection. Doc. 44 at 6. If Cook's statement about an "intersection" refers to the intersection of 4th Avenue and 1st Street, the Court agrees that the surveillance video does not depict Cook speaking to Paul and Cindy in the intersection. Where video evidence utterly discredits one party's version of events, a court should not rely upon a "visible fiction" should instead view the facts in the light depicted by the videotape. *Marantes v. Miami-Dade Cnty.*, 776 F. App'x 654, 663 (11th Cir. 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Here, Gualtieri does not rely upon this IAD report to argue that no genuine dispute of material fact exists that Cook had probable cause to arrest Bonett. Similarly, as for Bonett's argument that Cook states in his IAD report that a manger of Crabby Bill's told him that he observed a couple leave the restaurant with two males, Gualtieri does not rely upon this statement for his probable-cause analysis.

[15] Bonett argues that the audio recording "disproves [Cook's] claims" that Bonett and Paul advanced upon Cook in a threatening manner because Paul is not heard threatening anyone on the audio. Doc. 44 at 8. He also contends that the audio shows that Paul and Bonett could not have threatened or approached aggressively before the tasing, which Bonett contends occurs at the end of the recording when the woman says, "No!" *Id.*; *see* Doc. 44-6 at 4. Finally, he argues that the audio establishes that Paul could not have advanced upon Cook from the Indian Rocks Historical Museum to 2nd Street if he was holding a phone to his ear and that the statements on the audio "are not statements of individuals who are willfully assaulting a police officer." Doc. 44 at 9. These arguments stem from Bonett's assumptions, extrapolations, or interpretations of the audio recording. The recording speaks for itself. Bonett's arguments are unpersuasive.

Gualtieri reasons that, "[u]nder the totality of the circumstances, in light of Deputy Cook's specialized training, as well as the fact that he was in a very dark and isolated area with no witnesses, Deputy Cook's determination that he had probable cause to arrest" Bonett was reasonable, based on information then available to him, because while he was trying to deal with Paul and Cindy, [Bonett] appeared within 5 feet of him and his shirt was removed," which led Cook to believe that Bonett "was imminently going to attack him." Doc. 36 at 13. In recounting facts relevant to Bonett's arrival at the scene, Gualtieri relies heavily, but not exclusively, upon Cook's affidavit for support. *Id.* at 11–12. Cook's affidavit broadly states that Bonett appeared within five feet of him while he was interacting with Paul and Cindy, that Cook believed that Bonett was intoxicated, and that "suddenly his shirt was removed over his head." Doc. 34-3 ¶21. In addition to describing removal of a shirt as a pre-attack indicator, Cook stated that: he was already feeling threatened when Bonett suddenly appeared without a shirt; he was at a greater disadvantage as a result of being alone, outnumbered, and in the dark, with multiple people standing near him, whom he believed had been drinking and the shirt of one of them had been removed; he feared for his safety and believed that Cook would attack him; and the threat of multiple trained people who were possibly armed and had been drinking forced him to stagger his stance. He reiterated that he did not believe that he could successfully take Paul into custody once Bonett appeared with his shirt removed.

In discussing the "removal" of Bonett's shirt, Gualtieri does not point to Cook's initial report or deposition testimony, except to cite to a portion of the initial report

stating that Bonett removed his shirt and approached in an aggressive manner.[16] Doc. 36 at 12. The initial report and the deposition testimony place Bonett at the scene before Cook tased Paul and indicate that Bonett removed his shirt. According to the initial report, Bonett and Bill—both of whom smelled like alcohol and appeared to be intoxicated—approached Cook, and Bonett removed his shirt and approached in a hostile manner after Cook stepped in front of Paul. Similarly, Cook stated in his deposition that he first became aware of Bonett after he pushed Paul's shoulder because Bonett took off his shirt. Cook recalled that Bonett was three to five feet away from him when Bonett removed his shirt and that he was yelling expletives at Cook while removing the shirt and stating that he was a police officer. Both the report and the deposition indicate that Bonett continued to advance. Cook stated in his initial report that he even pointed his taser towards Bonett and ordered him to stop approaching. According to Cook's deposition, he informed Bonett that he needed to back away from him after Bonett removed his shirt, repeatedly said expletives, and identified himself as a police officer, which resulted in Bonett assuming an aggressive posture, staggering his stance, clenching his fists, continuing to yell expletives at Cook, and closing the distance. After the ineffective taser application against Paul, Cook faced a situation in which the two subjects of the domestic disturbance, one of whom had just resisted him, were in front of him, while Bonett was behind him. Cook

---

[16] Gualtieri's motion incorporates the factual section from Cook's motion. Doc. 36 at 2–3. In discussing the removal of the shirt, the factual section of Cook's motion also cites to this portion of the initial report and Cook's affidavit. Doc. 34 at 9.

testified that he was unable to detain Paul due to the threat posed Bonett approximately five yards behind him while continuing to clench his fists and approach in an aggressive manner. His report indicated that Bonett rushed towards him in a hostile manner after he took Paul to the ground.

Gualtieri's evidence is sufficient to discharge his summary-judgment burden. In response, Bonett fails to demonstrate that there is a genuine dispute of material fact that Cook had probable cause to arrest Bonett for obstruction of justice. Five points warrant attention. First, in contrast to Cook's statements about Bonett approaching in a hostile manner before he tased Paul, Bonett asserted that he arrived to the scene after Cook tased Paul. Indeed, Bonett stated that the first thing that he noticed when he came across everyone was that Paul had a taser prong in his arm, and he saw Paul remove the prong. Although Gualtieri does not point to Cook's statements about Bonett approaching in a hostile manner before Cook tased Paul to argue that Cook had probable cause, Bonett's assertion that he did not arrive to the scene until after Cook tased Paul is relevant to the probable cause analysis since the Court must examine the events leading up to the arrest. Second, although Cook stated in his report and deposition that Bonett approached and rushed him in a hostile manner, yelled expletives at him while removing his shirt, advanced towards him, assumed an aggressive posture, staggered his stance, clenched his fists, and closed the distance, Bonett denied clenching his fist towards Cook, balling up his fists, advancing towards him, approaching him in a threatening manner, yelling at him, or cursing at him.

Third, although Gualtieri argues that Bonett appeared within five feet of Cook with his shirt removed, Bonett denied being within five feet of Cook and described his distance from Cook in the form of a range (within five to ten feet) or, when discussing his distance when Bill grabbed him, as an approximation (five or ten feet, or "probably about" five feet).

Fourth, although Cook stated in his report and deposition testimony that Bonett removed his shirt and Gualtieri argues that Bonett's shirt "was removed," Bonett has denied removing his own shirt, including denying taking off his shirt as if he was preparing to fight Cook. Gualtieri argues that Cook believed that Bonett was going to attack him, but, according to Bonett, he went "down and away" as a "natural reaction" due to Bill's painful hold on his biceps, which resulted in his baggy shirt coming off in Bill's hands. Doc. 34-7 at 135:11–22, 136:2–8. 142:4–7. He stated that this occurred after he arrived on the scene and said, "What are you doing? You're out of control. We're all law enforcement." He stated that Bill did not hold him back, and he denied using profanity when he was near Cook or when Bill grabbed him. Bill also stated in his IAD statement that Bonett's shirt came off while he was holding Bonett.

Fifth and finally, although not expressly highlighted by Bonett, the Court notes that he testified during his deposition that he stayed with Bill after Cook tased Paul and after Cindy and Paul walked into the nearby park area. He estimated that he was around 40 feet away from Cook, Paul, and Cindy. Viewed in the light most favorable to Bonett, this testimony contradicts Cook's statements that Bonett was behind him as the "entire group" moved southbound, that Bonett continued to approach aggressively

after Paul reached the bench, and that Bonett rushed towards him in a hostile manner or approached him aggressively after Cook took Paul to the ground. Again, this testimony is relevant to the probable cause analysis since the Court must examine the events leading up to Bonett's arrest.

Even viewing the evidence in the light most favorable to Bonett and drawing all reasonable inferences in his favor, no genuine dispute of material fact exists that Cook had probable cause to arrest Bonett for obstruction of justice. An objectively reasonable officer could have only concluded that a probability or substantial chance existed that Bonett committed obstruction of justice. Upon his arrival to the dark area, where Cook interacted with Paul and Cindy, Bonett was within five or ten feet, or about five feet away from Cook for a few seconds, and he immediately questioned Cook, identified himself as law enforcement, and told Cook that he was "out of control." There is no dispute that Bill then grabbed Bonett and that Bonett's shirt somehow came off, which is consistent with a pre-attack indicator. Even if Bonett's shirt came off because Bill's grip hurt Bonett, his shirt still came off. Bonett also concedes that he later said, " "You're beating up my f******g brother-in-law" when officers subdued Paul. On these facts, an objectively reasonable officer could have only concluded that a probability or substantial chance existed that, while the officer engaged in the lawful execution of a duty, Bonett  obstructed the officer. Although Bonett denies clenching his fist towards Cook, balling up his fists, advancing towards Cook, approaching Cook in a threatening manner, yelling at Cook, or cursing at Cook, probable cause does not focus on whether conduct is innocent or guilty, but the degree

of suspicion that attaches to certain noncriminal acts. Probable cause is not a high bar. And these facts show that there is no genuine dispute of **material fact** that Cook had probable cause to arrest Bonett for obstruction of justice.

Therefore, based on the foregoing analysis, there is no genuine dispute of material fact that Cook had probable cause to arrest Bonett for obstruction of justice. As such, Gualtieri's motion is due to be granted.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Defendant Christopher Cook's Motion for Final Summary Judgment (Doc. 34) is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Defendant Christopher Cook and against Plaintiff Frank P. Bonett on Count I of the Amended Complaint.

3. Defendant Bob Gualtieri's Motion for Final Summary Judgment (Doc. 36) is **GRANTED**.

4. The Clerk is directed to enter judgment in favor of Defendant Bob Gualtieri, in his official capacity as Sheriff of Pinellas County, Florida, and against Plaintiff Frank P. Bonett, on Counts III and IV of the Amended Complaint.

5. The Clerk is directed to terminate all pending deadlines and to **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on December 29, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any